CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Attorneys for Defendant Goldman, Sachs & Co.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X
In re:                                                               :

ENRON CREDITORS RECOVERY CORP., et al.,       :

                      Reorganized Debtors.          :

-------------------------------------------------------------------- X
ENRON CORP.,                                                         :
                Plaintiff-Respondent,

                                             :

                 v.                                    :      Civ. No. 07-10527 (SAS)

GOLDMAN SACHS & CO.,                                           :

                Defendant-Petitioner.
-------------------------------------------------------------------- X
ENRON CORP.,                                                         :
                Plaintiff-Respondent,

                                             :

                 v.                                    :      Civ. No. 07-10530 (SAS)

GOLDMAN SACHS & CO.,                                           :      **ORAL ARGUMENT**
                                             **REQUESTED**
                Defendant-Petitioner.
-------------------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW IN SUPPORT OF GOLDMAN,**
**SACHS & CO.'S MOTION TO WITHDRAW THE REFERENCE**
**OF THE ADVERSARY PROCEEDINGS TO THE BANKRUPTCY COURT**

## PRELIMINARY STATEMENT

Enron's opposition essentially poses the riddle, "when is a security not a security?" Continuing its pattern of convenient inconsistency,[1] Enron contends that commercial paper *is not* a security for purposes of the "safe harbor" accorded under bankruptcy preference law to common securities transactions, but *is* a security for purposes of its novel "beneficiary" theory against Goldman Sachs premised on the 1933 Act's imposition of strict liability for sale of unregistered non-exempt securities.  It is precisely this sort of tactical shifting of positions that impairs stability in the U.S. securities markets and demands the involvement of an Article III Court familiar with interpreting and applying the federal securities laws.

Recognizing that its liberties with the securities laws will come to an end in a federal district court, Enron not surprisingly resists withdrawal, offering two arguments as to why this Court should decline this case.  First, relying on decades-old caselaw and ignoring more recent Supreme Court precedent and marketplace realities, Enron argues that its strict liability argument that Goldman Sachs benefited from eliminating exposure under § 12(a)(1) of the Security Act is *not* novel.  Even if that were true (it is not), that is not the standard; Enron's securities law liability claim satisfies the well-established test for mandatory withdrawal because its claim clearly requires a significant interpretation – and not mere application – of the federal securities laws.  Indeed, if its claim simply involved a plain application of well-established legal rules,

---

[1] In the Bankruptcy Court, for example, in responding to the motions to dismiss based on the § 546(e) settlement defense, Enron argued that its commercial paper <u>met</u> the SEC's criteria for the exemption under § 3(a)(3) of the Securities Act of 1933, including the "prime quality" standard, because "it was highly rated, short term, and intended to finance current business operations."  It further represented that at the appropriate time, it would "adduce substantial evidence, including expert testimony, to support its position" that the § 3(a)(3) exemption <u>applied</u>.  It also claimed, again contrary to its position here, that "Congress deliberately chose the common securities trade understanding, per the 1934 <u>and 1933 Acts</u>, to define the scope of the § 546(e) safe harbor, as opposed to the definition in § 101 of the Code" (which was the position advocated by Goldman Sachs and others).  Luft Decl. Ex. 1 (emphasis added).

Enron would have had no need to file the supporting expert report of law professor Franco.[2]

Second, Enron argues that the Bankruptcy Court might not have to reach the securities law question because its claim against Goldman Sachs is "multi-tiered." Enron posits that (a) notwithstanding Goldman Sachs' express agency agreement with Enron, there are nuances in the record which permit a conclusion that Goldman Sachs was not acting as an agent and mere conduit; and (b) based on some amorphous tort exposure that Professor Franco does not even address in his report, Goldman Sachs might have achieved some other type of rescindable "benefits" from Enron's commercial paper repurchases. Enron's securities beneficiary theory is its principal basis for seeking to hold Goldman Sachs liable for $352 million of commercial paper that Enron repurchased from customers (compared with the $30 million repurchased from Goldman Sachs' own inventory), and the only theory advanced by its expert. Enron's alternative theories, by contrast, are so thin and insubstantial on the now-completed record that a court will inevitably need to address that securities law theory.

Moreover, even if the Court were not required to withdraw the reference in this case (and we believe it must do so), it nevertheless has the power and discretion to, and should, do so.[3] This case has no relevance to the reorganization and financial rehabilitation of Enron Creditors Recovery Corp. (which was reorganized years ago and now exists only to sue people), and therefore in no way will interfere with the Bankruptcy Court's jurisdiction over matters "the

---

[2] We have included with this Reply the Rebuttal Expert Report we intend to file of Professor Donald C. Langevoort (the "Langevoort Report"). Luft Decl. Ex. 2. The Court need not decide which of the law professors is correct in order to decide this motion: we respectfully submit that simply reading these two Reports makes it abundantly clear that evaluating Enron's securities liability claim requires significant interpretation of the federal securities laws.

[3] Should this court have any question whether withdrawal is mandatory, it has wide discretion to do so as a matter of permissive withdrawal. See In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir. 1996) (affirming the district court's discretionary withdrawal of the proceeding for cause even where the issue was "plainly a core bankruptcy matter").

outcome of which affect the debtor or its reorganization" that animated the Court of Appeals in

In re Ionosphere Clubs, Inc., 922 F.2d 984, 994 (2nd Cir. 1990). Conversely, there are

compelling reasons why this Court should resolve this action: the issues may have substantial

impact on and upset the efficient operation of this nation's deeply troubled credit markets, as

acknowledged by the SEC, the Federal Reserve, and the Treasury, as well as Prof. Langevoort.

Luft Decl. Ex. 2 (Langevoort Rep. ¶ 5). See Enron Corp. v. Springfield Assoc's. LLC, No. 05-

01025 (SAS), 2007 WL 2446498 at *4 (S.D.N.Y. Aug. 27, 2007) (Scheindlin, J.) ("[P]roper to

consider the effect that the court's interpretation would have on the markets.").

## **ARGUMENT**

### I.     **Significant Interpretation, Rather Than Mere Application, Of The Securities Act Is Necessary For Enron To Recover From Goldman Sachs**

Enron chastises Goldman Sachs for supposedly ignoring the standard applicable to

mandatory withdrawals, but then proposes an artificial standard calculated to render withdrawal

a virtual impracticability. As Your Honor wrote less than two months ago, mandatory

withdrawal is appropriate "where substantial and material consideration of non-Bankruptcy Code

federal [law] is necessary" and "where the case would require 'the bankruptcy court to engage

itself in the intricacies' of non-Bankruptcy law, as opposed to 'routine application' of that law."

In re Dana Corp., No. 07 Civ. 8160 (SAS), 2007 WL 4205823, at *3 (S.D.N.Y. Nov. 20, 2007)

(Scheindlin, J.). A proceeding that requires interpretation of an "intensely factual" non-

bankruptcy issue also mandates withdrawal. Id. at *6. The issue presented need not be entirely

novel to meet this test, but novel issues of interpretation clearly suffice. In re Enron Corp., No.

04 Civ. 8177 (RCC), 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004).

Enron's claims plainly require an analysis of intricate issues under the federal securities

laws, a number of which are in fact novel (even if that were the standard). Indeed, apart from

Enron's theories of liability, even its position that the Securities Act and the Exchange Act define "security" differently is a unique argument, the resolution of which requires not only significant interpretation of both statutes, but also rejection of Supreme Court precedents holding that the definition of "security" is the same under both statutes. See, e.g., S.E.C. v. Edwards, 540 U.S. 389, 393 (2004) (citing Reves v. Ernst & Young, 494 U.S. 56, 60 n.1 (1990)).

Beyond that fundamental inconsistency, Enron's strict liability theory under § 12(a)(1) of the Securities Act, as detailed in the Langevoort Report, also requires significant interpretation of the securities laws and poses a number of additional novel issues.  The first is whether the SEC's "prime quality" gloss on the text of § 3(a)(3) – which underlies the stale caselaw cited by Enron – has any continuing vitality following Reves v. Ernst & Young, 494 U.S. 56 (1990).  The Supreme Court did not reach that issue in its decision, but Enron does not dispute that four of the five justices who addressed the question believed that, consistent with the Court's modern approach to statutory construction, it was inappropriate to limit the plain text of an exemption based on considerations of legislative purposes and legislative history.  Following that decision, there has been widespread recognition that the decades-old gloss on either § 3(a)(3) or § 3(a)(10) invoked by Enron may be less supportable than theretofore assumed.  See, e.g., John C. Coffee et al., Securities Regulation: Cases and Materials, 327 (10th ed. 2007) ("The SEC has long taken the position that the language in § 3(a)(10) applies only to investment grade commercial paper, but after Reves, this has become an open question.").

Even assuming, *arguendo*, that the prime quality standard is part of the § 3(a)(3) exemption, the question whether it would be satisfied here also presents significant interpretive issues under the Securities Act.  The "prime quality" standard has never been applied in the simplistic and mechanical way Professor Franco suggests or to support his extreme conclusion:

4

that dealers face <u>strict liability</u> – i.e., regardless of what they know or even could know – for the sale of facially exempt commercial paper that was awarded investment grade ratings at the time of issuance but which later, with the benefit of hindsight, might have been non-prime.

If a court determined it is appropriate to look to SEC guidance in interpreting the text of § 3(a)(3), it would look to how that guidance, along with the commercial paper market, has evolved over time.  As set forth in the Langevoort Report, the SEC has increasingly taken a market approach that defers to investment grade ratings by national rating agencies, the availability of backup credit facilities, and the sophisticated judgments of the institutional investors who have electronic access to detailed SEC filings concerning the issuer.  Whether Professor Langevoort is correct (and we believe he is), his analysis clearly is the type of complex interpretative exercise that Congress mandated must be done by an Article III Court.  <u>See, e.g.</u>, <u>In re Cablevision S.A.</u>, 315 B.R. 818, 821 (S.D.N.Y. 2004).

Even assuming that the cases cited by Enron arising out of the Penn Central bankruptcy still have vitality given these developments, these important issues were not addressed, much less definitively resolved by those decisions.  None of them even involved the availability of a § 3(a)(3) exemption or of strict liability under § 12 (a)(1) of the Securities Act.  The court in the leading decision involving dealers to emerge from the Penn Central bankruptcy, <u>Franklin Sav. Bank v. Levy</u>, 551 F. 2d 521 (2d. Cir. 1978), which did not involve § 12(a)(1) liability, found insufficient evidence that Goldman Sachs acted with scienter, and did not reach, much less embrace, the "prime quality" standard, although it expressed uneasiness about its application.[4] <u>Id</u>. at 528.

---

[4] The SEC Consent Decree arising from Penn Central, now dissolved for over a decade but trumpeted in Enron's opposition, is also an irrelevant red herring.  The SEC settled the charge that Goldman Sachs made a misrepresentation actionable under § 17(a) of the Securities Act, to which the § 3(a)(3) exemption has no application.

Finally, In re NBW Commercial Paper Litigation, 813 F. Supp. 7 (D.D.C. 1992), the only relatively modern case to even discuss § 12(a)(1) liability, provides no precedent for the result Enron seeks here, even assuming it would be followed in this Circuit.  That case concerned a bank which sold through its wholly-owned subsidiary sham commercial paper on the eve of bankruptcy to anyone with $25,000 to invest, including its own local customers.  The court found the § 3(a)(3) exemption unavailable under the totality of circumstances in that case, where the issuer's commercial paper program had no "prime rating," its own rating was far below investment grade, the issuer had no backup lines of credit to pay obligations coming due and no liquid assets, and there was evidence of sales to unsophisticated public investors.[5]  Id. at 18.  The SEC amicus brief relied on these factors as the basis for its argument that the exemption was not available.  Luft Decl. Ex. 3, Brief Of The SEC, Amicus Curiae, Civ. No. 90-1755 (RCL), (D.D.C., filed Aug. 24, 1992) at 33-46.  As Enron itself concedes, Opp. at 16, none of those factors is present here.

## II.    Enron's Primary Beneficiary Theory Is Not A Tertiary Argument But An Issue A Court Will Have To Address At The Summary Judgment Stage Of This Litigation

Enron claims that the Court may not need to reach its § 12(a)(1) theory because (a) there is allegedly "some evidence" Goldman Sachs could be held liable as an initial transferee despite its express agency arrangement, or (b) there may be some other (unasserted) benefit Goldman Sachs received from the transaction that might support a § 550(a) claim.  Until now Enron has been able to hide the ball as to the true nature of its claim against Goldman Sachs, on the argument that it was early in the case and fact discovery was ongoing. That is no longer the case

---

[5] The NBW case specifically rejects Enron's contention that it would be Goldman Sachs' burden to demonstrate the availability of the § 3(a)(3) exemption for a program that met the textual requirements of the exemption and announces a two-part test, which Enron does not even purport to apply.

here:  fact discovery is over.  <u>See</u> Goldman Sachs' Mot. at 9.

There is no gating issue or pure bankruptcy law question that the Court must decide before reaching the federal securities law question.  Notably, even the question whether § 550(a) intended to incorporate incidental benefits arising from the elimination of contingent liability under the federal securities laws is a novel question for which there is no direct precedent and further justifies removal.   In deciding that question a court will <u>have to</u> consider whether Congress intended to extend this form of indirect standing to assert securities law claims for bankruptcy debtors and to subject participants in the securities markets to a potentially ruinous form of additional liability.  Moreover, in <u>In re Ionosphere Clubs, Inc.</u>, 142 B.R. 645 (S.D.N.Y. 1992), the Court granted the withdrawal motion and determined that it had to decide for jurisprudential reasons whether liability arose under the federal statute (ERISA) before it could consider the bankruptcy question of whether a transaction that eliminated such liability would confer a rescindable benefit under § 550(a) of the Bankruptcy Code.

In all events, for purposes of deciding this motion to withdraw the reference, all that the Court needs to decide now is that it is *likely* that the securities law issue will be reached.  <u>See City of New York v. Exxon Corp.</u>, 932 F.2d 1020, 1026 (2d Cir. 1991).  And as shown below, in ruling on the motions for summary judgment that Goldman Sachs will file promptly following the completion of expert discovery, a Court will inevitably conclude that Enron's half-hearted alternative theories of liability are no more than makeweights.

## A.    <u>Goldman Sachs Was Not An Initial Transferee</u>

Enron does not dispute that it signed an agreement establishing and acknowledging Goldman Sachs' role as an agent and conduit for its commercial paper buyback transactions. This transaction involved the classic three-party situation where Goldman Sachs' only role was

7

to facilitate the settlement payments made from Enron to the actual beneficial holders of Enron's outstanding CP that wished to sell their positions. It is beyond dispute that a conduit is not an initial transferee against whom avoidable transfers can be recovered pursuant to § 550 of the Bankruptcy Code. See In re Finley Kumble, 130 F.3d 52, 57-58 (2d Cir. 1997) ("Every Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability, declining to find 'mere conduits' to be initial transferees."); see also In re Manhattan Invest. Funds Ltd., 07 Civ 2511 (MRB), 2007 WL 4440360 (Slip Op. Dec. 17, 2007). The arguments Enron advances in an attempt to undercut Goldman Sachs' conduit defense are utterly pretextual.

First, Enron argues that Goldman Sachs may have exceeded its agency agreement because the back-office mechanics of the buyback transactions caused Goldman Sachs to pay for the Enron CP with funds from its own account before receiving any funds from Enron. But the record demonstrates otherwise. At no point did Goldman Sachs ever risk its own capital or "front" its own funds. In buying back its CP, Enron forwarded Goldman Sachs the funds for that day's transactions – wired each day before 3:20 p.m. – before the settlement and exchange of any funds or CP. The Depository Trust Company's ("DTC") net settlement system wires net payments to participants at the end of the day, not throughout the day as transactions are made, and allows a party to a CP trade to cancel trades at any point before 3:20 p.m., as long as that party still has the CP in its account. Goldman Sachs thus retained the ability to cancel any purchase if Enron failed to fund its leg of the transaction.[6]  James Newgard, the Enron employee in charge of Enron's CP program in 2001, testified that Goldman Sachs carried out its duties under the Agency Agreement precisely as Enron wanted and that it did not "fail in any way to

---

[6]  The relevant facts are set forth in an expert report of Professor Macey, excerpts of which we have submitted as Luft Decl. Ex. 4. Although Enron bears the burden of proof on whether transfers occurred, it put in no expert report on the issue.

carry out the contractual undertaking it made to act as Enron's agent in connection with the buyback".  Luft Decl. Ex. 5 (Newgard 326:7-19).  Moreover, Newgard testified that Enron controlled all material terms of the buybacks.  See Luft Decl. Ex. 5 (Newgard Depo. 673:25-677:12, 326:20-327:20); see also Luft Decl. Ex. 4 (Macey Report ¶¶ 115-16).

     Second, Enron contends that Goldman Sachs was not its agent because some of the holders or beneficial owners of the Enron CP ("Non-Dealer Defendants" or "NDDs") claim that they were not orally told of the arrangement, or more often, have no recollection.  Goldman Sachs' agency relationship, however, is based on actual authority.  Accordingly, what Goldman Sachs' customers did or did not think about Goldman Sachs' agency status is irrelevant as a matter of law.  "[W]hether . . . [actual] agency is formed depends upon the actual interactions between the putative agent and principal, not on any perception a third party may have of the relationship."  Weil v. Murray, 161 F.Supp.2d 250, 258 (S.D.N.Y. 2001) (emphasis added) (quoting Itel Containers Intern. Corp. v. Atlanttrafik Exp. Serv. Ltd., 909 F.2d 698, 702  (2d. Cir. 1990)).  Importantly, not a single Enron or Goldman Sachs witness disputed that Goldman Sachs was Enron's agent for the purpose of the buyback transactions.  Moreover, every NDD Enron cites received a confirmation for that transaction with the words stamped on it, "Goldman, Sachs & Co. acted as agent for Enron Corp.," and not a single NDD raised an objection.  In every recorded conversation between a Goldman Sachs salesperson and a NDD the salesperson said that Goldman Sachs is acting as agent for Enron.  And Goldman Sachs witnesses testified they were told to convey that message.[7]

     Third, Enron's argument that it was coerced into entering the agency relationship and that it is therefore invalidated on the grounds of economic duress has no support in fact, in logic, or in

---

[7] The record in support for these facts is set forth in detail in Goldman Sachs' answers to Enron's contention interrogatories, a relevant excerpt of which is attached as Luft Decl. Ex. 6.

law.  See Int'l Halliwell Mines, Ltd. v. Cont. Copper & Steel Indus. Inc., 544 F. 2d 105, 108 (2d

Cir. 1976).  Goldman Sachs had no duty to assist Enron in repurchasing its commercial paper

(something Enron made the independent decision to do).  There is no evidence that Enron found

coercive Goldman Sachs' rational insistence that the risk of dealing with Enron (if any) remain

with the parties who would actually receive the settlement payments Enron intended to make.

Nor did Enron, which bought back its commercial paper to avoid bankruptcy and not to establish

a basis for bringing preference claims, suffer any conceivable harm from this arrangement.

      **B.**    **The Court Must Reach The Securities Law Issue Because It Is Enron's Only "Benefit" Theory**

      While Enron makes vague references that it might be able to recover from Goldman

Sachs as a beneficiary based on some potential common law tort claims, it cannot even articulate

what these theories are, let alone point to any law or facts that might support them. [8]   The time

for Enron to have advanced other theories was in Professor Franco's report, which "was prepared

to evaluate possible legal claims avoided by Goldman, other statutory sellers and certain

investment advisors in connection with the early redemption of Enron's § 3(a)(3) commercial

paper," and which in fact posits state law theories of recovery against other parties in this case.

But Professor Franco offers no opinion against Goldman Sachs other than the § 12(a)(1) theory.

<u>**CONCLUSION**</u>

      For the foregoing reasons, and those in Goldman Sachs' opening brief, this Court

should withdraw the reference.

---

[8] Enron's "new benefit theory" is likely just a smokescreen to avoid withdrawal, just as was the case on June 14, 2007, when Enron told the bankruptcy court that it had other benefit theories and would not be relying on any securities law claims.  See Luft Decl. Ex. 7 (June 14, 2007 Hearing Tr. at 53).  These other theories, however, were then never articulated in relevant contention interrogatory responses; nor did any Enron expert opine on them.

Dated:  January 4, 2008
      New York, New York

                    CLEARY GOTTLIEB STEEN & HAMILTON LLP

                    By    /s/ Thomas J. Moloney
                    Thomas J. Moloney
                    One Liberty Plaza
                    New York, New York 10006
                    (212) 225-2000
                    (212) 225-2999 (fax)

                    Attorneys for Goldman, Sachs & Co.