USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

07 Civ. 10527 (SAS)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X
                               :

In re                              :       **OPINION AND ORDER**
                               :

**ENRON CORP., et al.,**         :
                               :       **Chapter 11**
       **Reorganized Debtors.**  :       **No. 01-16034**
                               :       **Jointly Administered**
------------------------------------------------------X
**ENRON CORP.,**                :
                               :

          **Plaintiff,**        :
                               :       **Adversary Proceeding**
      **-against-**          :       **No. 03-92677**
                               :

**J.P. MORGAN SECURITIES, INC.,**  :
**et al.,**                     :
                               :

          **Defendants.**     :
------------------------------------------------------X
**ENRON CORP.,**                :
                               :

          **Plaintiff,**        :
                               :       **Adversary Proceeding**
      **-against-**          :       **No. 03-92682**
                               :

**MASS MUTUAL LIFE INSURANCE**  :
**CO., et al.,**                  :
                               :

          **Defendants.**     :
------------------------------------------------------X

1

```
-----------------------------------------------------X
ENRON CORP.,                          :
                                      :    07 Civ. 10527 (SAS)
                  Plaintiff,          :
                                      :    07 Civ. 10530 (SAS)
           -against-                  :
                                      :
GOLDMAN, SACHS & CO.,                 :
                                      :
                  Defendant.          :
-----------------------------------------------------X
```

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

On November 21, 2007, Goldman, Sachs & Co. ("Goldman") moved to withdraw the reference of the above-captioned adversary proceedings from the United States Bankruptcy Court for the Southern District of New York pursuant to section 157(d) of title 28 of the United States Code. These proceedings arose from transfers made by the Enron Corporation, now known as the Enron Creditors Recovery Corporation ("Enron" or "the Company") to repurchase and retire certain of its outstanding commercial paper (the "Transfers") prior to maturity in the period preceding its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Enron seeks to recover as voidable preferences and constructively fraudulent transfers the amounts it paid to repurchase and retire the commercial paper during that time, and seeks recourse against Goldman for its

2

participation in those Transfers.

Goldman now moves for mandatory withdrawal of the reference of these adversary proceedings on the ground that their resolution requires substantial and material consideration of the federal securities laws.  For the following reasons, Goldman's motion is denied because, although mandatory withdrawal may be warranted as these proceedings progress, it is not required at this time.

## II.    BACKGROUND

### A.    The Transfers[1]

Beginning in 1993, Enron operated a commercial paper program pursuant to section 3(a)(3) of the Securities Act of 1933 (the "Securities Act" or the "Act")[2] under which it was authorized to issue commercial paper equal to the amount of its revolving credit facilities (which, at the time, totaled approximately

---

[1]    An extensive account of the facts underlying the above-captioned adversary proceedings has been previously set forth by the bankruptcy court. *See, e.g., In re Enron Corp.*, 325 B.R. 671, 677-82 (Bankr. S.D.N.Y. 2005).  I draw from the facts recited in those Opinions as well as those set forth by the parties in their submissions on the instant motion.

[2]    15 U.S.C. § 77c(a)(3).

three billion dollars).[3]  By late October 2001, the market for Enron commercial

paper had collapsed in response to, inter alia, its announcement of a one billion

dollar charge against the Company's third-quarter 2001 earnings, the launch of a

Securities and Exchange Commission ("SEC") inquiry into the Company, and the

likely downgrade of Enron's debt ratings.[4]  In response, Enron drew on its

revolving lines of credit on October 25, 2001.[5]  From October 26 through

November 6, 2001, Enron initiated a series of transactions by which it transferred

over one billion dollars in prepayments to purportedly retire certain of its

unsecured, outstanding commercial paper prior to its stated date of maturity.[6]

Enron alleges that it paid par value plus accrued interest for the

commercial paper notes, which was significantly greater than their market value at

---

[3]      *See* Memorandum of Law in Support of Goldman, Sachs & Co.'s
Motion to Withdraw the Reference of the Above-Captioned Adversary
Proceedings to the Bankruptcy Court ("Def. Mem.") at 6.

[4]      *See* Memorandum of Law in Opposition to the Motion of Goldman,
Sachs & Co. to Withdraw the Reference to the Bankruptcy Court ("Debtor Opp.")
at 5.

[5]      *See id.*

[6]      *See id. See also In re Enron Corp.*, 325 B.R. at 679-80 (stating that
the purchase and sale of Enron's commercial paper were made pursuant to terms
set forth in a September 14, 2001 Offering Memorandum, which provided that the
notes are not redeemable or subject to voluntary prepayment by Enron prior to
maturity).

the time.  As a result, Enron "characterizes the Transfers as being made for the early redemption of the [n]otes" and contends "that such Transfers were in violation[] of the terms of sale of those [n]otes because the terms expressly prohibited any early redemption or prepayment of the [n]otes."[7]  According to Enron, "such sudden and massive prepayments at accrued par and not market prices were extraordinary events in the [commercial paper] market."[8]  Enron seeks avoidance of those transfers conducted between October 26 and November 6, 2001 as, inter alia, preferential payments and fraudulent conveyances under the Bankruptcy Code.[9]

During this period, Goldman served as one of Enron's three commercial paper dealers, assisting Enron with the placement of its commercial paper with institutional investors, and making a secondary market in the paper.[10] Enron alleges that "Goldman knew that Enron could not make the prepayments" in the fall of 2001 without Goldman's assistance since Enron "lacked the infrastructure necessary to process the payments, did not know the identity of the

---

[7]     *Id.* at 680.

[8]     Debtor Opp. at 6.

[9]     Specifically, Enron seeks avoidance of the transfers and recovery under sections 544(b), 547(b), 548(a), and 550 of the Bankruptcy Code.

[10]    *See* Def. Mem. at 6.

5

holders, nor how much Enron [commercial paper] they held, nor the discount rate at which the Enron [commercial paper] had been purchased . . . ."[11]

According to Enron, it agreed to enter into a written agency agreement with Goldman on October 28, 2001 that purportedly authorized Goldman to act as Enron's agent in transferring the prepayments.[12]  Pursuant to that agreement, Goldman assisted Enron in repurchasing $352 million in commercial paper from institutional holders.[13]  Enron finished making these prepayments on November 6, 2001.  Shortly thereafter, the Company filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 2, 2001.

### B.    Procedural History

Enron brought the above-captioned adversary proceedings against various defendants, including Goldman, in 2003.  "In each adversary proceeding, Enron sought to avoid and recover certain transfers to the defendants that it

---

[11]    Debtor Opp. at 6.

[12]    *See id.*

[13]    *See* Def. Mem. at 3 n.1.  Goldman also sold Enron thirty million dollars worth of commercial paper it had held in its inventory as a result of its activity as a secondary market maker.  *See id.*  Because Goldman did not act as an agent for those transfers, they are not within the scope of the instant motion.  *See* Debtor Opp. at 7.

alleged were preferential or otherwise avoidable."[14]  Enron premises Goldman's liability on its alleged status as an initial transferee, or as a beneficiary of the transfers under section 550(a) of the Bankruptcy Code.[15]

In 2004, "substantially all" of the defendants in the adversary proceedings moved to dismiss Enron's amended complaints in these adversary proceedings.[16]  The primary ground for defendants' motion was that the Transfers constituted payments by Enron to purchase its outstanding commercial paper, and thus qualified as "settlement payments" to complete securities transactions, which are protected from avoidance by the Bankruptcy Code's safe harbor provision.[17]  Defendants contended that the Transfers further qualified as "settlement payments" because they were made by or to a stockbroker, financial institution, or through a securities clearing agency.[18]

---

[14]  *In re Enron Corp.*, 325 B.R. at 677.

[15]  *See* Debtor Opp. at 7. Section 550(a) provides: "Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . ."

[16]  *In re Enron Corp.*, 325 B.R. at 681.

[17]  *See id.*

[18]  *See id.*

7

By Opinion and Order dated June 15, 2005, the bankruptcy court denied the motions to dismiss.  The court held, inter alia, that because the Bankruptcy Code's safe harbor provision – section 546(e) – protects from avoidance those "settlement payments" that are "commonly used in the securities trade," evidence would have to be presented at trial as to "whether payments made with respect to short-term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents[,]" constitute "settlement payments commonly used in the securities trade."[19]

Moreover, because the safe harbor provision only applies to qualifying purchases and sales of securities, the court held that evidence would have to be presented as to whether the Transfers were made to repurchase the commercial paper notes, or to retire and extinguish the debt represented by the notes.  If, after trial, the payments are found to have been made to retire and extinguish the debt, the court would then have to determine whether such payments – "which were not then for the purchase, sale or loan of securities but were to satisfy the underlying debt obligation" – nonetheless qualify as "settlement payments" under section 546(e).[20]  On the other hand, "if the payments

---

[19]     *Id.*

[20]     *Id.* at 686-87.

8

were made to repurchase the [n]otes, the [c]ourt would yet have to address the issue of whether the short-term commercial paper at issue qualifies as a security within the scope of section 546(e) of the Bankruptcy Code."[21]

Shortly thereafter, by Opinion and Order dated July 29, 2005, the bankruptcy court denied defendant Merrill Lynch Investment Managers, L.P.'s ("Merrill Lynch") pre-discovery motion for summary judgment, which it had made primarily on the ground that, as an investment advisor, it cannot, as a matter of law, be a transferee, recipient, beneficiary, or owner of Enron commercial paper. Moreover, Merrill Lynch argued that the fraudulent transfer claims should be dismissed because Enron received reasonably equivalent value and fair consideration in connection with the Transfers. In denying the motion, the bankruptcy court held that it was "premature to consider the motion for summary judgment prior to affording Enron an opportunity to conduct discovery," particularly where the "essential facts are within [defendants'] control."[22] By Memorandum Decision and Order dated January 17, 2007, Judge George Daniels of this Court denied defendants' motions for leave to appeal the bankruptcy

---

[21] *Id.* at 687.

[22] *In re Enron Corp.*, Nos. 01-16034, 03-92677, 03-92682, 2005 WL 3873891 (Bankr. S.D.N.Y. July 29, 2005).

court's denial of summary judgment.[23]

Defendants also moved for leave to file an interlocutory appeal of the bankruptcy court's denial of their motions to dismiss, as well as mandatory and permissive withdrawal of the reference of these proceedings to the bankruptcy court.[24] Goldman did not join in these motions,[25] which were denied in their entirety by Judge Daniels by Memorandum Decision and Order dated January 25, 2008.[26]

Defendants contended that mandatory withdrawal was warranted because "the resolution of their 'settlement payment' defense will require substantial and material consideration of federal securities law," particularly with respect to the inquiry into whether Enron's commercial paper is a "security."[27] In

---

[23]    *See In re Enron Corp.*, No. M-47, 2007 WL 120458 (S.D.N.Y. Jan. 17, 2007).

[24]    Defendants' simultaneous motion for a stay of discovery in the adversary proceedings pending leave to appeal was denied by the bankruptcy court. *See In re Enron Corp.*, Nos. 01-16034, 03-92677, 03-92682, 2006 WL 2400411 (Bankr. S.D.N.Y. May 10, 2006).

[25]    *See* 11/27/07 Letter from Thomas J. Moloney, Goldman's counsel, to the Court, at 2.

[26]    *See In re Enron Corp.*, No. M-47, 2008 WL 281972 (S.D.N.Y. Jan. 25, 2008).

[27]    *Id.* at *6.

denying the motion, the Court explained that the bankruptcy court must first determine whether the Transfers were made to repurchase the notes or to retire the debt represented by the notes, and that a finding of the latter would obviate the need to reach the question of whether the commercial paper constitutes a security. Withdrawal of the reference was not necessary because it was "premised upon an issue that the bankruptcy court may never be required to consider."[28]

On August 1, 2005, following the bankruptcy court's denial of defendants' motions to dismiss, Goldman filed its Answer. The parties subsequently engaged in discovery, which closed on September 21, 2007.[29] On October 29, 2007, the parties submitted expert reports, and Enron submitted the report of Professor Joseph A. Franco (the "Franco Report").[30] Based primarily on the Franco Report and by motion dated November 21, 2007, Goldman moved to withdraw the reference of these adversary proceedings on the ground that Enron "triggered" mandatory withdrawal by purportedly premising Goldman's liability

---

[28]    *Id.* The Court also denied defendants' motion for permissive withdrawal of the reference on the ground that defendants had failed to proffer any new basis for permissive withdrawal for "cause" based on defendants' right to a jury trial in the district court, and withdrawal was not warranted "prior to the time the cases near trial readiness." *Id.* at *7.

[29]    *See* Def. Mem. at 9, 11.

[30]    *See id.* at 11.

as a beneficiary of the Transfers on the argument that Goldman "benefited from

the elimination of potential liability under [s]ection 12(a)(1) of the Securities Act

that could have fallen on Goldman [] as a statutory seller of unregistered securities

if Enron had defaulted on the payment of its outstanding [commercial paper]."[31]

Specifically, according to Goldman's motion, Enron now claims that

it was insolvent at the time it issued the commercial paper in question, and as a

result, the paper was not eligible for the section 3(a)(3) exemption from the

registration requirements of the Securities Act because it was not "prime." These

sales of commercial paper during the relevant period therefore violated section 5

of the Securities Act,[32] which prohibits the sale of securities that do not comply

with the Securities Act's registration requirements and are not subject to a valid

exemption.[33] Assuming this argument to be true, those investors who purchased

Enron's commercial paper from Goldman could have brought a private right of

action against Goldman under section 12(a)(1) of the Securities Act.[34] Because

Enron repurchased the commercial paper through the Transfers, Goldman's

---

[31]    *Id.* at 4.

[32]    15 U.S.C. § 77e.

[33]    *See id.* at 11.

[34]    15 U.S.C. § 77l(a)(1).

potential liability under section 12(a)(1) was eliminated, and Goldman therefore

benefited from the Transfers.[35]   Under this theory, Enron seeks to hold Goldman

liable under section 550(a) for the value of the Transfers for which Goldman acted

as Enron's agent because Goldman qualifies as an "entity for whose benefit such

transfer was made . . . ."[36]

## III.   APPLICABLE LAW

### A.    Mandatory Withdrawal

Section 157(d) mandates that the district court withdraw a proceeding

referred to the bankruptcy court if "resolution of the proceeding requires

consideration of both title 11 and other laws of the United States regulating

organizations or activities affecting interstate commerce."  The Second Circuit

Court of Appeals construes this provision "narrowly," requiring withdrawal of the

reference only if "substantial and material consideration of non-Bankruptcy Code

federal [law] is necessary for the resolution of the proceeding."[37]   In construing the

phrase "substantial and material consideration," "courts have held [such]

---

[35]      *See id.* at 11-12.

[36]      11 U.S.C. § 550(a)(1).

[37]      *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*,
922 F.2d 984, 995 (2d Cir. 1990) (citations omitted).

consideration arises when a determination of issues requires 'significant *interpretation* of federal laws that [C]ongress would have intended to have decided by a district judge rather than a bankruptcy judge . . . .'"[38]  Withdrawal of the reference may also be mandated where "issues arising under non-title 11 laws dominated those arising under title 11 . . . ."[39]

Mandatory withdrawal is therefore appropriate where the case would require "the bankruptcy court to engage itself in the intricacies" of non-bankruptcy law, as opposed to "routine application" of that law[40] or the "straightforward application of a federal statute to a particular set of facts."[41]  The "bare contention" that non-bankruptcy law is dispositive or in conflict with the Bankruptcy Code is not sufficient.[42]

---

[38]    *In re Texaco Inc.*, 84 B.R. 911, 921 (S.D.N.Y. 1988) (quoting *United States v. Johns-Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y. 1986)) (emphasis in original).

[39]    *Id.* (citation omitted).

[40]    *Id.  Accord City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir. 1991).

[41]    *Mishkin v. Ageloff (In re Adler, Coleman Clearing Corp.)*, 270 B.R. 562, 564 (S.D.N.Y. 2001).

[42]    *California v. Enron Corp. (In re Enron Corp.)*, No. 05 Civ. 4079, 2005 WL 1185804, at *2 (S.D.N.Y. May 17, 2005) (holding that the "bare contention" that a claim involves Federal Power Act and Natural Gas Act preemption issues and conflicting Federal Energy Regulatory Commission

## B.    The Securities Act

The stated objective of the Securities Act, also entitled the "Truth in

Securities Act,"[43] is to "provide full and fair disclosure of the character of

securities sold in interstate and foreign commerce and through the mails, and to

prevent frauds in the sales thereof . . . ."[44] The Securities Act accomplishes this

objective by requiring, inter alia, that companies disclose important information

about their offered securities through registration of those securities with the SEC,

unless an exemption under the Act applies.[45]

---

opinions regarding tariffs is not sufficient to require withdrawal).

[43]    *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 218 n.9 (2d Cir. 2000) (citing *United States Code Annotated, Popular Name Table for Acts of Congress* (1997)).

[44]    15 U.S.C. §§ 77a-77mm (preamble). *See The Laws That Govern the Securities Industry*, U.S. Securities and Exchange Commission, available at http://www.sec.gov/about/laws.shtml#secact1933 (listing the "two basic objectives" of the Securities Act as the requirement that "investors receive financial and other significant information concerning securities being offered for public sale," and the prohibition of "deceit, misrepresentations, and other fraud in the sale of securities"). *See also P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004) (listing the goals of the Securities Act as "registration, disclosure, and private enforcement").

[45]    *See* 15 U.S.C. § 77f. *See also Registration Under the Securities Act of 1933*, U.S. Securities and Exchange Commission, available at http://www.sec.gov/answers/regis33.htm.

### 1.    Section 3(a)(3)

Section 3(a)(3) exempts from the Securities Act's registration

requirements

> [a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has the maturity at the time of issuance of not exceeding nine months, exclusively of days of grace, or any renewal thereof the maturity of which is likewise limited . . . .[46]

### 2.    Section 5

Section 5 of the Securities Act prohibits the offer and sale of

securities that have not been registered with the SEC and that are not otherwise

exempt under the Act.  Section 5 provides that

> [u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or . . . to offer to sell or offer to buy [such security] . . . .[47]

### 3.    Section 12(a)(1)

Section 12(a)(1) creates a private right of action against sellers of

---

[46]    15 U.S.C. § 77c(a)(3).

[47]    *Id.* § 77e.

16

unregistered securities and provides that

> [a]ny person who (1) offers or sells a security in violation of section 5 [of the Act] . . . shall be liable, subject . . . to the person purchasing such security from him, who may sue either at law or in equity . . . to recover the consideration paid for such security with interest . . . less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.[48]

## IV.   DISCUSSION

It is undisputed that the Securities Act is a federal statute that regulates organizations or activities affecting interstate commerce.  The main points of contention between the parties are *first*, whether Enron's theory of liability – premised on Goldman's status as an alleged beneficiary of the Transfers, as set forth in the Franco Report – constitutes an issue that the bankruptcy court must reach in order to resolve the claims against Goldman; and *second*, whether the resolution of that issue requires "substantial and material consideration of non-Bankruptcy Code federal [law],"[49] mandating withdrawal of the reference.

Goldman contends that the Franco Report sets forth the sole basis upon which Enron seeks to hold Goldman liable as a beneficiary of a number of the Transfers.  According to Goldman, "a court will inevitably need to address

---

[48]   *Id.* § 77l.

[49]   *In re Ionosphere Clubs*, 922 F.2d at 995.

17

th[is] securities law [beneficiary] theory"[50] because Enron's only alternative theory of liability – *i.e.*, that Goldman can be held liable as an initial transferee of some of the Transfers – is "so thin and insubstantial on the now-completed record" that it can be easily discarded.[51]  Goldman argues that once the bankruptcy court reaches the beneficiary theory, it will be required to conduct an "analysis of intricate issues under the federal securities laws"[52] because Enron's theory raises the novel issue of whether liability under section 12(a)(1) can be imposed on a dealer of section 3(a)(3) commercial paper when the dealer relied on credit rating agencies' ratings of the issuer's paper as well as the existence of unsecured, backup credit lines.[53]

Additionally, Goldman contends that the bankruptcy court would have to resolve a number of issues of first impression in order to find Goldman liable under Enron's beneficiary theory.  These issues include whether the scope of section 3(a)(3)'s exemption from the Securities Act's registration requirements is limited by SEC interpretive guidance, which states that commercial paper must

---

[50]    Reply Memorandum of Law in Support of Goldman, Sachs & Co.'s Motion to Withdraw the Reference of the Adversary Proceedings to the Bankruptcy Court ("Reply Mem.") at 2.

[51]    *Id.*

[52]    *Id.*

[53]    *See* Def. Mem. at 14.

be of prime quality in order to qualify for the exemption.[54]  Further, Goldman

argues that even assuming the prime quality limitation to section 3(a)(3)'s

exemption applies,[55] the court would still have to resolve whether dealers can be

held strictly liable under section 12(a)(1) "for the sale of facially exempt

commercial paper that was awarded investment grade ratings at the time of

issuance but which later, with the benefit of hindsight, might have been non-

prime."[56]  According to Goldman, because the resolution of all of these issues –

and ultimately, the issue of Goldman's liability as a beneficiary –would require the

---

[54]      *See* SEC Securities Release No. 4412 (1961), *reprinted in* 36 Fed.
Reg. 9158 (1961).  *Compare* Reply Mem. at 4 ("The first [novel issue] is whether
the SEC's 'prime quality' gloss on the text of § 3(a)(3) . . . has any continuing
vitality following *Reves v. Ernst & Young*, 494 U.S. 56 (1990) . . . .  Following
that decision, there has been widespread recognition that the decades-old gloss . . .
invoked by Enron may be less supportable than theretofore assumed.") *with*
Debtor Opp. at 15-16 ("[T]he SEC has long required that [commercial paper] must
be of prime quality to qualify for the § 3(a)(3) exemption from the registration
requirement . . . [s]ince then, the SEC has scoffed at the suggestion that the courts
have rejected the prime quality requirement.") (citations omitted).

[55]      *See American Fed'n of State, County & Mun. Employees v. Federal
Deposit Ins. Corp. (In re NBW Commercial Paper Litig.)*, 813 F. Supp. 7, 17
(D.D.C. 1992) (post-dating the Supreme Court's decision in *Reves* and stating that
the SEC's interpretive guidance limiting section 3(a)(3)'s exemption to
commercial paper of prime quality "has generally been acknowledged by the
courts of appeals," including the Second Circuit and "no court addressing the
subject has rejected the SEC's interpretation") (citing, inter alia, *SEC v. American
Bd. of Trade*, 751 F.2d 529, 538-39 (2d Cir. 1984)).

[56]      Reply Mem. at 5.

bankruptcy court to substantially and materially consider the Securities Act, this Court must withdraw the reference.

Despite the narrow issue before the Court on the motions to withdraw, Enron devotes a substantial portion of its opposition to arguing the merits of its theory that Goldman is liable as a beneficiary. Presumably, Enron does so in an effort to demonstrate that its theory, including the critical element of its claim that commercial paper does not qualify as prime quality based on its commercial rating, is well-settled and requires "at most the application of law to new facts."[57] In doing so, however, Enron contradicts its own position that mandatory withdrawal of the reference is not warranted.

As an initial matter, the parties' submissions, including Enron's opposition, as well as the parties' dueling expert reports on Enron's beneficiary theory,[58] reveal that "non-bankruptcy law [] dominates th[ese] proceeding[s] . . . ."[59] Indeed, the parties do not dispute that the resolution of Goldman's alleged

---

[57]     Debtor Opp. at 3.

[58]     *See, e.g.*, Expert Report of Professor Donald C. Langevoort Submitted by Goldman, Sachs & Co. ("Langevoort Report"), Ex. 2 to Declaration of Avram E. Luft, Goldman's Counsel, in Support of the Reply Memorandum in Support of Goldman, Sachs & Co.'s Motion to Withdraw the Reference of the Adversary Proceeding to the Bankruptcy Court.

[59]     *Mishkin v. Ageloff*, 220 B.R. 784, 798-99 (S.D.N.Y. 1998).

liability as a beneficiary of the Transfers rests solely on the application of the

Securities Act.  The crux of the dispute between the parties is whether the

resolution of this issue – to the extent it is even reached by the bankruptcy court –

requires the substantial and material consideration, and "significant interpretation"

of the Securities Act, "as opposed to [the] simple application" of the law to the

facts presented.[60]

      In arguing against mandatory withdrawal, however, Enron's

opposition misguidedly focuses on whether the question of commercial ratings as

dispositive of commercial paper's status as prime quality constitutes a novel

issue.[61]  In doing so, Enron misses the point because the district court is not

required to find that novel or unsettled questions of non-bankruptcy law are

presented in order to withdraw the reference.  While the resolution of a novel or

unsettled issue of non-bankruptcy law may necessarily require significant

interpretation of that law, for Goldman "[t]o satisfy the substantial-consideration

test [for mandatory withdrawal], the issues of non-bankruptcy law raised by the

---

[60]    *Exxon Corp.*, 932 F.2d at 1026.

[61]    *See* Debtor Opp. at 14-19.

proceeding need not be unsettled or involve matters of 'first impression.'"[62]

In an effort to demonstrate that the bankruptcy court need only apply established law to facts, Enron contends that "each component" of its beneficiary theory of liability is "established under the law."[63]  Enron, however, cites exclusively to decisions issued by district courts rather than bankruptcy courts in support of its propositions.[64]  "Although not dispositive, this is an indication that the issues addressed in th[is] motion[] are of a type which Article III courts have frequently been called upon to address."[65]

Furthermore, if, as Enron contends, the application and interplay of section 3(a)(3) and section 12(a)(1) can be straightforwardly applied to the facts at issue without substantial and material consideration – presumably resulting in Goldman's strict liability as a beneficiary – then it is unclear why Enron would

---

[62]    *Enron Power Mktg., Inc. v. California Power Exch. Corp.*, No. 04 Civ. 8177, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (quoting *McCrory Corp. v. 99¢ Stores (In re McCrory Corp.)*, 160 B.R. 502, 505 (S.D.N.Y. 1993)).

[63]    Debtor Opp. at 14.

[64]    *See id.* at 15-19.

[65]    *Mishkin*, 220 B.R. at 799 (granting the motion to withdraw the reference where nonbankrupcty law dominated the proceeding and where the asserted claims and supporting theories were complex, and noting as an influencing factor that "the overwhelming majority of cases cited by the [non-moving party] were decided by Article III courts").

relegate this theory to a "secondary" or even "tertiary" position.[66] This suggests that resolution of the beneficiary theory is not as straightforward as Enron posits.

After careful consideration, I conclude that resolving the questions of whether Goldman benefited from those Transfers for which it acted as Enron's agent through the elimination of its potential liability under section 12(a)(1), and whether it is therefore liable to Enron under section 550(a)(1), requires substantial and material consideration of the Securities Act.  Accepting Enron's argument and assuming that the SEC's interpretive guidance limiting the scope of section 3(a)(3)'s exemption still applies, that exemption creates a "presumption [that] is rebuttable with evidence that sales are made to the public (or other unsophisticated investors) *and* that the investments are of less-than-prime quality."[67]

Goldman contends that the section 3(a)(3) presumption of exemption cannot be rebutted where, at the time of the Transfers at issue, the commercial

---

[66]    Debtor Opp. at 19 ("Only after the Bankruptcy Court first decides which defendants were the initial transferees and that Goldman was not one of them would it need to consider whether Goldman could be held liable as a beneficiary through reduction in Goldman's exposure to its customers, and only after that determination would the court need to decide the alternative issue of strict liability under § 12(a)(1).").

[67]    *In re NBW Commercial Paper Litig.*, 813 F. Supp. at 18 (emphasis in original).

paper was assigned prime investment grade ratings,[68] backup credit facilities

totaling three billion dollars existed,[69] and the paper was sold to sophisticated

institutional investors who had "electronic access to detailed SEC filings

concerning the issuer."[70]  Enron is correct that the investment grade ratings, in and

of themselves, may not be dispositive of whether the paper is prime, but the

ratings are one of several factors, "including the financial strength of the issuer,

[and] support of the commercial paper by a form of credit enhancement . . . ."[71]

The inquiry into these factors may be largely factual in nature, but the bankruptcy

court will likely confront policy issues as it determines whether the interplay

among section 3(a)(3), the SEC's interpretive guidance, and section 12(a)(1)

warrants the imposition of strict liability on a dealer who "did not know and could

not practicably have discovered the facts that later call prime quality [of the

commercial paper] into doubt."[72]  Tellingly, neither party has cited to any case that

---

[68]     *See* Def. Mem. at 6 ("During September and October 2001, Standard & Poor's [] and Moody's assigned Enron's [commercial paper] prime ratings of A2 and P2 respectively, with S&P reaffirming its rating on October 25, 2001.").

[69]     *See id.*

[70]     *Id.* at 5.

[71]     *UBS Asset Mgmt. (New York) Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66, 69 (S.D.N.Y. 1996) (citation omitted).

[72]     Langevoort Report ¶ 1.

bears directly on this issue or presents a similar set of facts. Because its resolution will require significant interpretation, mandatory withdrawal and resolution by this Court is warranted.

This holding, however, does not require the immediate withdrawal of the reference to the bankruptcy court of these adversary proceedings. Enron argues that, under its primary and "initial theory of recovery," it seeks to hold Goldman liable as an "initial transferee" of the Transfers at issue.[73] "If Goldman were found to be the initial transferee of the funds, then Enron's second argument, that Goldman was the beneficiary of the [T]ransfers, is moot."[74] Having filed the instant motion to withdraw only upon receipt of the Franco Report, which relates solely to Enron's beneficiary theory, Goldman has impliedly conceded that Enron's "initial transferee" theory is not subject to mandatory withdrawal and may be adjudicated by the bankruptcy court.[75]

The parties do not dispute that Goldman's liability as an initial transferee can and should be decided first, and that issue can be adjudicated by the

---

[73]    Debtor Opp. at 19.

[74]    *Id.*

[75]    *See* Def. Mem. at 15-16 ("Upon learning Enron's theory of recovery now depends on novel securities law interpretations, Goldman Sachs timely filed this motion.").

bankruptcy court on a record that is now complete or nearly complete.  Because

the issue requiring substantial and material consideration of non-Bankruptcy Code

federal law might be rendered moot, withdrawal of the reference is not mandated

at this time.  "[A] court should take into consideration whether the withdrawal

motion is based upon speculation about federal issues which may or may not arise

and may or may not be germane to resolution of core [Bankruptcy] Code

proceedings."[76]  Indeed, "[m]ere speculation that the bankruptcy court may have to

determine, at some future time, a securities law issue is an insufficient basis for

withdrawing the reference."[77]

   Whether Enron's beneficiary theory premised on section 12(a)(1) will

have to be reached in order to resolve the proceedings should become evident

shortly since Goldman plans to move for summary judgment  immediately

following the completion of expert discovery.[78]  As Enron notes, "[I]t is highly

possible that the [b]ankruptcy [c]ourt will decide Enron's claims against Goldman

without ever reaching the securities law issue," and may grant Goldman summary

judgment "on its other defenses, such as the settlement payment safe harbor" or on

---

[76] *In re Texaco Inc.*, 84 B.R. at 921.

[77] *In re Enron Corp.*, 2008 WL 281972, at *6 (citations omitted).

[78] *See* Reply Mem. at 7.

beneficiary theories of liability premised on "state law fiduciary duty claims by customers and not under [section] 12(a)(1)."[79]  To the extent that those issues can be decided without having to reach the Securities Act issue – which may be rendered moot by the decision – the bankruptcy court should do so.  If and when the section 12(a)(1) issue requires resolution, the reference to the bankruptcy court will be withdrawn.

## V.    CONCLUSION

For the reasons set forth above, Goldman's motions to withdraw the reference are denied at this time.  The Clerk of the Court is directed to close these motions [Docket Entry No. 1 in 07 Civ. 10527 and Docket Entry No. 1 in 07 Civ. 10530] and these cases.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 10, 2008

---

[79]    Debtor Opp. at 20.

**- Appearances -**

**For Plaintiff:**

Richard L. Wasserman, Esq.
Michael Schatzow, Esq.
Venable LLP
1800 Mercantile Bank & Trust Bldg.
Two Hopkins Plaza
Baltimore, MD 21201
(410) 244-7400
Fax: (410) 244-7742

Frank A. Oswald, Esq.
Howard P. Magaliff, Esq.
Togut, Segal & Segal LLP
One Penn Plaza, Ste. 3335
New York, NY 10119
(212) 594-5000
Fax: (212) 967-4258

**For Defendant:**

Max Gitter, Esq.
Thomas J. Moloney, Esq .
Lindsee P. Granfield, Esq.
Clearly Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
Fax: (212) 225-3999